**In Proceedings for the Reorganization of a Railroad.**

**In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.**

**No. 30226.**

United States District Court
D. Connecticut.
July 28, 1969.

See also D.C., 304 F.Supp. 1136.

Lester C. Migdal, Migdal, Low, Tenney & Glass, New York City, and Lander, Greenfield & Krick, New Haven, Conn., for Harry Rebell and Lester W. Rubin as The New York, NH and HRR Co. First Mortgage 4% Bondholders Committee.

Dennis N. Garvey, New Haven, Conn., and Mulholland, Robie & Hickey, Washington, D. C., for Railway Labor Executives' Assn.

Louis J. Lefkowitz, Atty. Gen. State of New York, Albany, N. Y., for State of New York.

Myron S. Isaacs, New York City, for Oscar Gruss & Son.

Frank J. Fazzano, Director of Business Regulation, State of Rhode Island, Providence, R. I., for State of Rhode Island.

Robert K. Killian, Atty. Gen. of Connecticut, Hartford, Conn., for State of Connecticut.

Ulrich Schweitzer, Gen. Corporate Counsel, New York City, for Penn Central Co.

Robert H. Quinn, Atty. Gen. Commonwealth of Massachusetts, Boston, Mass., for Commonwealth of Massachusetts.

Wilkie Bushby, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Chase Manhattan Bank.

Simpson, Thacher & Bartlett, New York City, for Manufacturers Hanover Trust Co.

Hale, Grant, Meyerson, O'Brien & McCormick, New York City, for Providence & Worcester R. Co.

Paul A. Sweeney, Sp. Asst. to Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for the United States.

Walter A. Kernan, Carter, Ledyard & Milburn, New York City, for United States Trust Co. of New York.

James William Moore, counsel to trustee, New York, New Haven & Hartford Railroad Co., New Haven, Conn., for Interstate Commerce Commission.

MEMORANDUM OF DECISION ON DISTRIBUTIVE OR STEP II PORTION OF FOURTH SUPPLEMENTAL REPORT AND ORDER OF INTERSTATE COMMERCE COMMISSION

ANDERSON, Circuit Judge (sitting by designation).

Following the Fourth Supplemental Report and Order of the Interstate Commerce Commission, 334 I.C.C. 25, dated November 25, 1968 and the Commission's certification of a Plan of Reorganization to this court on December 2, 1968, this court on December 24, 1968, by its Order No. 559 and its accompanying Memorandum of Decision, approved and ordered the transfer of substantially all of the assets of the Debtor railroad (New Haven) to the Pennsylvania Central Company (Penn Central), free and clear of all liens. The transfer was to be effected by January 1, 1969; Penn Central was concurrently to pay to the Trustees of the New Haven the consideration which the Commission in its Report found to be fair and equitable; and all of this was to be without prejudice to the right of any party to contest the fairness and adequacy of the consideration. The foregoing was accomplished on December 31, 1968.

Subsequently, after notice to all parties in interest, this court held a hearing on March 31–April 2, 1969 on the issue of price and the distributive or Step II provisions of the Plan; and on May 28, 1969 filed its Memorandum of Decision on the Issue of Price, 304 F.Supp. 793.

The court then believed, or at least hoped, that in a short time it would be feasible for it to pass definitively on all remaining issues, i. e., the distributive provisions of the Plan of Reorganization, as certified to this court by the I.C.C.; and that a remand of the Plan to the Commission might not be necessary. It was encouraged in this belief by the constructive opinion of the Commission's counsel that a remand to the Commission would not be required to overcome the objections of the administration claimants in *Class A* and *Class B*. These classes deal, respectively, with counsel fees, and with the trustees' certificates. Their treatment is hereinafter discussed. A more troublesome problem concerns the settlement and payment in cash of claims, up to the time of the consummation of the Plan, where that would be mutually beneficial to the claimant and to the estate. It is not unlikely that this problem could also have been resolved without a remand to the Commission, or by a very restricted remand limited to that matter.

A subsequent event of major impact, however, has altered this promising outlook and it now appears that it is necessary to remand the Plan and that it be held by the Commission in abeyance until the matter of price is determined with finality. The Three Judge Court in the Southern District of New York rendered its opinion on June 18, 1969, one judge dissenting in part, concerning the same issue of price dealt with by this Reorganization Court on May 28th; but that court approached the most important issues in a substantially different manner and reached a widely different result. The additional price to be paid by Penn Central, as fixed by this Reorganization Court, is approximately $29 million more than the Commission by its Fourth Supplemental Report ordered Penn Central to pay. The Three Judge Court's majority opinion, however, approved in substance the Commission's order, although it directed the Commission to

serve a proposed decree, which "among other things, shall reflect in dollar amounts the changes directed in this opinion". Pursuant thereto the Commission by its Fifth Supplemental Report and Order of July 10, 1969, service date July 11, 1969, 334 I.C.C. 528, purported to increase by $5.33 million the consideration to be paid by Penn Central. But erroneously included in this ostensible price increase is $3.38 million, which represents a debt due by Penn Central to New Haven for the latter's one-half interest in the excess income of the Grand Central Terminal properties for 1967 and 1968, and is not a part of the price to be paid by Penn Central for New Haven's assets. Since the Three Judge Court has not yet acted upon the Commission's Fifth Supplemental Report, it is not known whether it agrees with the position of this, the Reorganization Court, although its opinion reads as if it were in accord. Be that as it may, the increase in price ordered by the Commission's Fifth Supplemental Report is only $1.95 million; and, therefore, the present price differential between the Reorganization Court and the Commission is approximately $27 million.

This price difference alone makes appeals and cross-appeals from both courts inevitable. If this conclusion needs buttressing, it is supported by at least three additional factors:

(1) The payment by Penn Central and receipt of the consideration by New Haven on December 31, 1968, as heretofore mentioned, was without prejudice to the right of any party (including Penn Central) to contest the fairness and adequacy of the consideration.

(2) The ultimate value of New Haven's interest in the Grand Central Terminal properties might far exceed that which this court has found. Take, for example, only one item, although a major one, and that is the value of New Haven's right of access to the Grand Central Terminal, which the I.C.C. found to be of no value—a determination which this court finally concluded in its Memorandum of May 28, 1969, could not be disturbed, although in its opinion of August 13, 1968 (289 F.Supp. 451, at 463), it was of the view that on remand the I.C.C. should reconsider on the basis that the New Haven's right was valuable. If on appeal the existence of such a right were to be recognized, the evidence presently in the record would show a potential worth of approximately $70 million.

(3) The price of $87.50 attached by the Commission and this court to the Penn Central stock for purposes of partially satisfying Penn Central's obligation to New Haven raises a serious issue, even though this court provided a formula for payment in its Memorandum of May 28, 1969, which has since been adopted in substance by the I.C.C. in its Fifth Supplemental Report.

The ultimate matter of price is far too much at large for the Reorganization Court presently to determine whether the Plan of Reorganization "affords due recognition to the rights of each class of creditors", § 77(e), which includes not only the bondholders but also one other pre-reorganization class of claimants—claims of state and local authorities for pre-reorganization secured tax claims (*Class H*)—and six classes (*Class A* through *Class F*, inclusive) [1] of administration claimants. Further, if this court were now so venturesome as to approve the Plan in substance, how could the various classes of creditors vote intelligently on it? It is abundantly clear in the present posture of the case that approval must await a final determination as to price and, presumably, that issue can be definitely determined only by the Supreme Court, unless a settlement between the parties in litigation can be effected and approved by this court and other authorities, if necessary.

1. As a practical matter the six classes of administration claimants are but five, since *Class C*, the Flood and Shop loans, is not "affected by the plan because the claims in such class will be satisfied in accordance with order No. 347 of the court". Section II, 1 and 4(a).

Some comment and rulings on the distributive, or Step II, provisions of the Plan are, however, in order. First the three matters in the Plan to which reference has been made will be discussed: counsel fees, trustees' certificates, and settlement, even after approval of the Plan, of certain other claims. This done, there will follow a discussion of certain other matters.

*Counsel Fees and Trustees' Certificates*

Section II of the Plan classifies administration claims, within which these two types of asserted obligations are included, as follows:

"*Class A.*—Costs and expenses incurred in connection with the reorganization proceedings and the plan, as may be fixed by the Commission and allowed by the court in accordance with the provisions of sections 77(c) (2) and 77(c) (12) of the Bankruptcy Act.

"*Class B.*—Trustees' certificates."

Section V of the Plan then provides for the method of payment of such claims as follows:

"1. *Administration claims.*

"*Class A.*—Payment of expenses and allowances, as distinguished from fees, shall be made in cash. Fees shall be paid by issuance and delivery of installment notes equal in principal to the claims at the effective date or as thereafter fixed from time to time by orders of the Commission and the court.

"*Class B.*—Trustees' certificates shall be extended in maturity with modified interest rate."

Two provisions in Section IV, which deals with securities to be issued by the reorganized company, round out the picture.

"1. *Trustees' certificates.*—The maturity of the trustees' certificates outstanding at the effective date shall be extended to a date 7 years from the confirmation date. The interest rate shall be changed to the prime rate of the Morgan Guaranty Trust Company of New York City as of the said con-

firmation date, but not less than 5¼ percent per annum. A sinking fund shall be established commencing with the fourth anniversary of the confirmation date to retire annually 10 percent of the principal amount outstanding at the effective date.

"2. *Installment notes.*—Each installment note shall be dated the date of its issuance and mature in five equal annual installments commencing with the first anniversary of its date of issuance. The installment notes shall not bear interest."

A brief comment on the treatment of the trustees' certificates will suffice. A railroad in reorganization must often have the power to borrow money, at reasonable rates of interest, if it is to remain a viable railroad. This principle is axiomatic, and there certainly can be no doubt that the power was needed in the case of the New Haven. But the power will exist only if the terms of the trustees' certificates are scrupulously observed. Faith in and reliance upon the Federal Court's authorization go with the certificates. Their terms cannot be unilaterally modified by a plan. Without discussing the Plan's unilateral modification as to the extension of the maturity of the certificates, rate of interest, and sinking fund provision, the objection of the Irving Trust Company is sustained as a matter of law. The terms of the trustees' certificates must be meticulously observed, unless the obligor and obligee mutually agree upon other terms.

With regard to the Plan's treatment of counsel fees, as set out above, § 77(c) (2) provides:

"* * * The trustee or trustees and their counsel shall receive only such compensation from the estate of the debtor as the judge may from time to time allow within such maximum limits as may be approved by the Commission as reasonable. * * *"

The Trustees (and now the sole Trustee) and their counsel, Professor Moore, have regularly received compensation in ac-

cordance with § 77(c) (2). And Sullivan & Worcester, as special counsel, utilized primarily, although not exclusively for reorganization matters, has from time to time received interim allowances pursuant to § 77(c) (2). For these persons the Plan contemplates a continuance of this practice up to the consummation date.[2]

Section 77(c) (12) provides:

"(12) Within such maximum limits as are fixed by the Commission, the judge may make an allowance, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and within such limits may make an allowance to be paid out of the debtor's estate for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures, depositaries and such assistants as the Commission with the approval of the judge may especially employ. * * *"

No allowances have been sought or made under § 77(c) (12).

■ Fees of counsel within subsection (c) (12) are, under the Plan, to be paid in installment notes. See Section V, 1. *Class A, supra.* Counsel for indenture trustees and other creditor interests, within (c) (12), have objected to this treatment. These objections are sustained as a matter of law, for § 77(e) contemplates payment in cash, unless the persons within (c) (12) are willing to be "paid in securities provided for in the plan". But it would not be fair to objecting counsel to let the matter rest solely on the barebones of the statute; or even upon objections that ranged farther afield, such as the no-interest bearing character of the installment notes, the

necessity of discounting them substantially below par, the postponement of actual payment so far in the future, possible tax disadvantages, and other related matters. The court also desires to stress another matter, and that is relatively equal treatment, so far as that is possible, of these counsel with counsel and special counsel for the Trustees who are subject to (c) (2), and with several other special counsel employed by the Trustees, with the approval of this court, whose compensation is not subject to the maximum limits of (c) (2) or (c) (12) since they perform services that would have to be performed for the Debtor even if it were not in reorganization, such as tort litigation. Without any attempt at an exhaustive catalogue the court will list some other specifics: the successful post-reorganization completion of the *Biltmore* litigation to the financial enhancement of New Haven's interest in the Grand Central Terminal properties; per diem litigation, which is now bearing fruit in settlements which are very advantageous to the New Haven; tax abatement and negotiated settlements; and Boston & Providence Railroad litigation, which is gradually drawing that reorganization to a successful completion over the protest of a strident, miniscule group of obstructionists. These counsel have been compensated either when a specific task has been completed or from time to time, as the circumstances of the particular matter warranted. The aggregation of counsel fees in these and other situations comprises a substantial sum, but it is a small fraction of the benefits that the estate has received in return.

This reorganization has presented a myriad of complex legal problems. The resolution of many have ploughed new ground. In the process of working these out through the adversary system, it has been of immense importance to have counsel of outstanding skill and competence to analyze and present the points at issue. Able counsel for the Commission, the Penn Central, the States and certain

2. Only in the event that additional allowances were made to them would these be satisfied by installment notes under Section X of the Plan.

claimants against the Debtor's estate are, of course, not compensated out of the estate. Counsel for the trustees for the bond issues and for the First Mortgage 4% Bondholders Committee are, however, subject to the provisions of (c)(12). They have devoted an enormous amount of time and energy to the case, and the high order of their professional competence has made a very significant contribution to the reorganization proceedings. Present counsel for the Trustees for the First Mortgage Bonds and counsel for the Trustee for the Income Bonds have participated since the filing of the petition on July 7, 1961. There have been two sets of counsel for the Bondholders Committee, one succeeding the other, and separate counsel has appeared for Oscar Gruss & Son. The Indenture Trustees, their counsel and others who are entitled at this time to reimbursement of expenses and to compensation may, if counsel deem it advisable, apply for interim allowances, and the court will entertain such petitions. As Penn Central has assumed the Harlem River bonds, to the advantage of their holders, it would appear that the Indenture Trustee for these bonds and its counsel could proceed for final reimbursement of expenses and compensation.

*Settlement and Payment of Certain Claims*

■ The Plan is deficient in not providing that any claim covered by it can be settled and paid in cash, subject to the approval of the Reorganization Court, up to the time of the consummation of the Plan, rather than in securities of the reorganized company. In particular, the court has in mind tort, per diem, and tax claims. Under the Plan these claims are to be paid by income notes of the reorganized company. [See Section V, 1. *Class F* (for tort claims); *Class E* (for per diem claims); *Class D* and *Class H* (for tax claims)]. None of the holders of these claims filed objections to the Plan; and the court is satisfied with the treatment accorded them provided there is added an allowance for the making of interim negotiated settlements.

*Post-reorganization tort claims*

"*Class F* of Section V, 1. provides:

"*Class F.*—Claims, other than those in classes A through E, which may be found by the court to be entitled to be treated as administration claims, shall be paid by issuance and delivery of income notes in principal amount equal to the principal amount of the claims as may be determined by the court."

■ All types of post-reorganization tort claims, both employee and non-employee, fall within *Class F*.[3] But satisfaction of these claims should not await consummation of the Plan. This court's Order No. 73, dated February 20, 1962, provided for installment payments in cash of certain tort claims. The practice under this Order has, in general, proved satisfactory and mutually beneficial to both the claimant and the estate. It should be continued. And it may be continued since the court is not now aproving the distributive provisions of the Plan. But following remand to the Commission, the Plan should be modified to permit, as a general proposition, settlement and cash liquidation of post-reorganization tort claims on a basis comparable to that now utilized, up to the time the Plan is consummated.[4]

3. Some other claims arising out of pre-reorganization torts are also entitled to be treated on a parity with administration claims. See § 77n. In the main these would include pre-reorganization F.E.L.A. and workmen's compensation claims, although by this time most of these have been satisfied.

4. The text is intended as a general guideline and leaves the Commission with power to work out deviational details, if necessary. See note 3, *supra*, as to some matters that may need consideration.
In addition, most of the post-reorganization tort claims may be satisfied by the time the Plan is consummated, and so it may be desirable to provide for the assumption of those which have not been satisfied and for cash payment by the reorganized company in a lump sum or by installments, rather than by income notes.

*Post-reorganization per diem claims*

Pre-reorganization per diem claims have no equity, and take nothing under the Plan. As to post-reorganization per diem, *Class E* of Section V, 1. provides:

"*Class E.*—Claims for freight car rentals applicable to the period commencing July 7, 1961, shall be paid by issuance and delivery of income notes in principal amount equal to the principal amount of the claims as may be finally determined in appropriate proceedings, or as may be settled from time to time by the trustees or the reorganized company with the claimants."

Negotiated settlement and cash liquidation of post-reorganization per diem claims are now proceeding to the mutual satisfaction of the claimants and the estate.[5] This should be continued. And it, like the liquidation of post-reorganization tort claims, may be continued since the court is not now approving the distributive provisions of the Plan. Following remand to the Commission, the Plan, however, should be modified to permit settlement and cash liquidation of post-reorganization per diem claims up to the time the Plan is consummated.[6] Thereafter any such remaining claims should be satisfied in accordance with *Class E* of the Plan.

*Taxes*

The discussion of taxes will embrace both pre- and post-reorganization taxes, interest and penalties. Unsecured pre-reorganization taxes may be disposed of quickly. They have no equity; they take nothing under the Plan; and, of course, that is true as to interest and penalties on such taxes.

The matter is somewhat different as to pre-reorganization secured tax claims, since they are entitled to share in distribution, and the Plan so provides. *Class H* of Section V, 2. provides:

"*Class H.*—Claims of State and local authorities for taxes and related charges applicable to the period prior to July 7, 1961, that may be found by the court to be secured, together with the interest accrued thereon to July 7, 1961, *if found by the court to be secured,* shall be paid by issuance and delivery of income notes in principal amount equal to the amount of the claims as may be determined by the court. Claims for postbankruptcy interest, *if found by the court to be secured,* shall be paid by income notes in principal amount equal to the amount of the claims, in the same manner as interest to July 7, 1961. No payment is to be made for any penalty or other such charge." (Emphasis added.)

It is clear that *Class H* deals only with pre-reorganization secured tax claims. Interest accrued and is payable on those claims up to the time of the institution of the reorganization proceedings, i. e., July 7, 1961. For reasons subsequently stated, claims for post-bankruptcy interest are not allowable and, therefore, cannot be secured and take nothing under *Class H*, which also properly provides that no payment is to be made for any penalty or other such charge. See *infra.*

Post-reorganization tax claims, both secured and unsecured, are administration claims. *Class D* of Section V, 1. provides:

"*Class D.*—Claims of State and local authorities for taxes and related charges applicable to the period commencing July 7, 1961, shall be paid by issuance and delivery of income notes in principal amount equal to the principal amount of the claims as may be determined by the court. No payment

---

5. The settlements usually embrace both pre- and post-reorganization per diem, with cash payment attributable solely to post-reorganization per diem. This procedure disposes of the whole matter of a particular claim without any prejudice to the estate.

6. Here and in related situations where the court speaks of the satisfaction of claims up to the time of consummation, the court intends that the Commission should have the power to fix a time prior to consummation if that would be feasible and proper.

will be made for interest applicable to such period or for any penalty or other such charge."

This concluding provision for non-payment of interest or penalties is correct. See *infra*.

As previously stated, no tax claimant filed any objection to the Plan; and the court is satisfied with the foregoing treatment accorded them under the Plan, subject to the following: the court should retain the power to approve negotiated settlements with tax claimants in *Class D* and *Class H* up to the time the Plan is consummated. Since it is not approving the Plan that power continues; but following remand, the Plan should be modified to recognize and affirm that power up to the time of consummation. That time is probably far off, and it may well be to the mutual advantage of such tax claimants and the estate to negotiate settlements, at some fair percentage of the claims, as is being done currently with per diem claims, and then to liquidate any settlement, even though it may differ from the manner of that provided for in the Plan, probably by cash payment in a lump sum or in installments. The problem needs to be approached realistically and with mutual fairness. Tax claims in *Class D* and *Class H* which are not so settled prior to consummation, should be paid in income notes as presently provided in the Plan.

*Interest*

The problem of the *allowability* [7] of interest on pre- and post-reorganization claims in this § 77 proceeding is a difficult one. This is due to a shift in the law, beginning with City of New York v. Saper, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949), toward the disallowance of post-bankruptcy interest on claims, see United States v. Edens, 189 F.2d 876 (4 Cir. 1951), *aff'd per curiam* 342 U.S. 912, 72 S.Ct. 357, 96 L.Ed. 682 (1952), (citing *Saper*); Smith v. Robinson, 343 F.2d 793, 800 (4 Cir. 1965); 6A Collier on Bankruptcy (14th ed.) ¶ 9.08; and the possible need to distinguish between ordinary bankruptcy on the one hand, and reorganization and arrangement (§ 77, Chap. X and Chap. XI) proceedings on the other.

At the outset there may be put aside the problem of interest on unsecured pre-reorganization claims, including tax claims, for the Debtor is so insolvent that these claims, even as to principal, have no equity. The claims with which this discussion is here concerned are: (1) pre-reorganization interest-bearing, secured claims, which include the consensual liened claims of the two system mortgages, and pre-reorganization secured claims of state and local authorities for taxes and related charges;[8] and (2) post-reorganization claims of all kinds, including both secured and unsecured tax claims.

Consideration of the subject must start with ordinary bankruptcy that is designed for liquidation of the

---

7. The fact that a claim for post-bankruptcy interest may not be allowable merely means that it does not share in the distribution of the estate. It does not mean that the claim is invalid. See *infra* where it is pointed out that post-bankruptcy income accruing on a security may be applied against post-bankruptcy interest; that post-bankruptcy interest is payable where the estate is solvent; and that post-bankruptcy interest on a non-dischargeable claim remains a liability of the debtor in *bankruptcy*.

"The principle that interest stops running from the date of the filing of the petition in bankruptcy should be understood as a rule of liquidation practice rather than as a rule of substantive law. * * * In liquidating interest-bearing claims, the computation of interest must be made as of some fixed date. The law selects as decisive the date of the filing of the petition in bankruptcy. It disregards, for the purposes of liquidation, interest accruing beyond that date. Yet this is primarily a technical device to cope in the most convenient and equitable manner with the debtor's apparent insolvency." 3A Collier on Bankruptcy (14th ed.) ¶63.16, p. 1858.

8. See *Class H* of Section V, 2. of the Plan, set out in text *supra*. No other types of tax claims are involved in this reorganization.

debtor's assets primarily for the benefit of unsecured creditors, and with Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911), decided 38 years prior to *Saper, supra. Dreyfus* dealt with the claim of a partially secured non-tax creditor for post-bankruptcy interest on his pre-bankruptcy, interest-bearing claim. It held that such a secured creditor selling his securities after the filing of the petition could not first apply the proceeds to interest accrued since the date of the bankruptcy petition, unless (a) the security produced post-bankruptcy income, in which case that income could be applied against post-bankruptcy interest on his main claim; or (b) the debtor proved to be solvent.[9] In discussing the applicable principles, Justice Holmes stated:

> "For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date. Interest was not computed beyond the date of the commission. * * * This rule was applied to mortgages as well as to unsecured debts; * * * and notwithstanding occasional doubts it has been so applied with the prevailing assent of the English judges ever since. * * * the rule was laid down not because of the words of the statute but as a fundamental principle. We take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we cop-

ied the system, somewhat as the established construction of a law goes with the words where they are copied by another state. No one doubts that interest on unsecured debts stops. * *

> "The rule is not unreasonable when closely considered. It simply fixes the moment when the affairs of the bankrupt are supposed to be wound up. If, as in a well known illustration of Chief Justice Shaw's (Parks v. City of Boston, 15 Pick. 198, 208), the whole matter could be settled in a day by a pie-powder court, the secured creditor would be called upon to sell or have his security valued on the spot, would receive a dividend upon that footing, would suffer no injustice, and could not complain. * * *
> " * * *

> "Interest and dividends accrued upon some of the securities after the date of the petition. The English cases allow these to be applied to the after-accruing interest upon the debt. * * There is no more reason for allowing the bankrupt estate to profit by the delay beyond the day of settlement than there is for letting the creditors do so. Therefore to apply these subsequent dividends, etc., to subsequent interest, seems just." 219 U.S. 339, 344–346, 31 S.Ct. 256, 257.[10]

Despite *Dreyfus* the lower federal courts generally did allow interest on tax claims up to the date of payment under the Bankruptcy Act of 1898, because § 64(a)

---

9. Literally, Justice Holmes did not deal with the rare case where the bankrupt estate proves to be solvent. The English cases recognized, however, that "if the alleged 'bankrupt' proved solvent, creditors received post-bankruptcy interest before any surplus reverted to the debtor." And the two exceptions stated in the text have been carried over from the English practice into our system. New York v. Saper, *supra*, 336 U.S. 328 at 330, 69 S.Ct. 554, 93 L.Ed. 710.

10. *Accord:* Ex parte Bennet, 2 Atk. 527, 528 (1743), where Lord Hardwicke stated: "Commissioners, after a man becomes a bankrupt, compute interest upon debts no lower than the date of the commission,

because it is a dead fund, and in such a shipwreck, if there is a salvage of part to each person, in this general loss, it is as much as can be expected."
This is quoted with approval in Matter of Pavone Textile Corp. (Bloom), 302 N.Y. 206, 211, 97 N.E.2d 755 (1951), aff'd per curiam 342 U.S. 912, 72 S.Ct. 357, 96 L.Ed. 682 (1952) (on authority of *Saper, infra*).
See also American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway, 233 U.S. 261, 266, 34 S.Ct. 502, 504, 58 L.Ed. 949 (1914) (In an equity receivership case, Justice Lamar stated the general rule: "As this delay was the act of the law, no one should thereby gain an advantage or suffer a loss.")

gave tax claims an absolute priority over all claims; they did not have to be filed, and the trustee was under a duty to search out and pay them. Following the Chandler Act revision of the Bankruptcy Act in 1938, which assimilated tax claims to other debts by requiring them to be filed and allowed and relegating them in bankruptcy to a fourth priority, New York v. Saper, *supra*, held that unsecured pre-bankruptcy tax claims—municipal, state, and federal—would bear interest only until bankruptcy and not until payment so far as the distribution of an insolvent estate was concerned. In so holding Justice Jackson referred approvingly to the fundamental principle that post-bankrupty interest is not allowable, subject to the two exceptions dealing with a solvent estate and the application of post-bankruptcy income from a security against post-bankruptcy interest, neither of which is applicable to the New Haven estate. A third exception in American bankruptcy law is that post-bankruptcy interest runs on a consensual, fully secured claim.[11] Exclusive of this third exception, the foregoing history of the denial or award of interest on claims in bankruptcy is more fully set forth in Nicholas v. United States, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966). The specific holding of that case, however, is distinguishable from the present case, as discussed *infra*.

The principle of *Dreyfus* and *Saper* that bankruptcy creditors should not be prejudiced by the law's delay has been applied to stop interest on pre-bankruptcy statutory tax liens, whether federal or non-federal, including real estate tax liens. United States v. Harrington, 269 F.2d 719 (4 Cir. 1959) (federal tax lien); United States v. Bass, 271 F.2d 129 (9 Cir. 1959) (similar); In re Kerber Packing Co., 276 F.2d 245 (7 Cir. 1960) (similar; in Chapter X); In re Industrial Machine & Supply Co., D.C., 112 F.Supp. 261 (similar in Chapter X, but ending in bankruptcy); In re Lykens Hosiery Mills, 141 F.Supp. 895 (S.D.N.Y.1956) (federal tax lien in bankruptcy); City of Utica v. Gold Medal Packing Corp., 55 Misc.2d 881, 286 N.Y.S.2d 617 (Supreme Court 1967) (city's real estate tax lien); New Jersey & New York R. Co. Reorganization, 290 I.C.C. 9, 13 (1953), *reaff'd* 290 I.C.C. 119, 129 (1953) (New Jersey's property tax lien).

United States v. Harrington, *supra*, a leading case in this area, held that a pre-bankruptcy statutory tax lien in favor of the United States is not entitled to post-bankruptcy interest, although the court recognized the general rule that a fully secured mortgagee would be entitled to post-bankruptcy interest.[12] But this

---

11. Weeks v. McInnis, 200 F.2d 611 (6 Cir. 1952) (on vendor's lien on certain real estate for the balance of the purchase price which the debtor had contracted to pay), cert. den. 345 U.S. 958, 73 S.Ct. 940, 97 L.Ed. 1378 (1953). But the rule of *Weeks* would not be applied in favor of a federal tax lien. In re Lykens Hosiery Mills, 141 F.Supp. 895 (S.D.N.Y.1956).

12. As to the mortgage, the court stated: "In spite of the strong reasons against allowing post-bankruptcy interest to the secured creditor, even though the value of his security exceeds his claim for both principal and interest, several cases have allowed such interest in certain special situations. * * * Usually the allowance has been to a mortgagee, in apparent reliance upon Coder v. Arts, 1909, 213 U.S. 223, 245, 29

S.Ct. 436, 53 L.Ed. 772, where the Court, without any discussion, (as the case was primarily concerned with whether or not the particular mortgage involved was a fraudulent conveyance), affirmed the Circuit Court of Appeals in allowing post-bankruptcy interest to a mortgagee. It appears that the cases following Coder involve either mortgages (as in Coder), deeds of trust, bonds secured by collateral, or a vendor's lien on a particular chattel. * * *" 269 F.2d 723, 724.

*Cf.* note 14, *infra*, concerning reliance upon Coder v. Arts. And see City of Utica v. Gold Medal Packing Corp., *supra*, also adverting to and recognizing the distinction between tax and consensual liens; In re Black Ranches, Inc., 362 F.2d 8, 15 (8 Cir. 1966), cert. den. 385 U.S. 990, 87 S.Ct. 595, 17 L.Ed.2d 450 (1966); Weeks v. McInnis, *supra* note 11.

latter proposition is also subject to equitable considerations, which play a commanding role in this area. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946).[13] In *Vanston,* a Chapter X reorganization, the corporation, although insolvent, had sufficient assets to pay the first mortgage bondholders in full, including interest on interest as their mortgage indenture provided. While conceding that the first mortgage bondholders should receive simple interest on the principal, subordinate creditors challenged the bondholders' right to interest on interest; and the Court sustained this challenge on equitable principles. In so doing, Justice Black referred to delay necessitated by law if the courts are properly to preserve and protect insolvent estates, that generally it is inequitable for anyone to gain an advantage or suffer a loss because of such delay, and that

> "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership, and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." 329 U.S. at 165, 67 S.Ct. at 241.[14]

And the Supreme Court has generously applied the equitable principles of *Vanston* to railroad reorganization.[15]

In the New Haven proceeding, as in *Vanston,* no one has objected to the allowance, under the Plan, of simple postbankruptcy interest on the first mortgage bonds. Because of this and supporting precedents, the Plan's general treatment need not be disturbed. Some of the first mortgage bondholders have, however, contended that the Plan is unfair to them in stopping the accrual of

13. In re Magnus Harmonica Corp., 262 F.2d 515 (3 Cir. 1959) (secured creditor who made uncontested overcharges against debtor, which overcharges were binding upon bankruptcy trustee, denied post-petition interest on his secured claim); In re Inland Gas Corp., 241 F.2d 374 (6 Cir. 1957) (post-bankruptcy interest was not allowable in a Chapter X reorganization proceeding on claims that had priority over a subordinated claim, which had been allowed and remained unsatisfied), cert. den. 355 U.S. 838, 78 S.Ct. 35, 2 L.Ed.2d 50 (1957); and see Smith v. Robinson, 343 F.2d 793 (4 Cir. 1965) (court disallowed pre-bankruptcy interest on claims of officer of corporate bankrupt in Chapter X).
See also United States Trust Co. v. Zelle, 191 F.2d 822 (8 Cir. 1951) (in railroad reorganization of Wisconsin Central, court applied the *Vanston* doctrine to deny interest at a rate exceeding that stated in bonds although allowed by state law and the bonds and interest were amply secured, cert. den. 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 703 (1952).
But equitable considerations warrant enforcement of a higher contractual rate of interest, following default, in a Chapter XI proceeding where the debtor is solvent and disallowance would only benefit the debtor's stockholders. Ruskin v. Griffiths, 269 F.2d 827 (2 Cir. 1959).

14. As to Coder v. Arts, relied on by United States v. Harrington, to distinguish between the allowance of post-bankruptcy interest on mortgages and the disallowance of post-bankruptcy interest on tax claims, see note 12, *supra,* Justice Black states, 329 U.S. 156, at 164, 67 S.Ct. 237, at 241, "But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor. Coder v. Arts, 213 U.S. 223, 245 [29 S.Ct. 436, 445, 53 L.Ed. 772]."

15. Fleming v. Traphagen, 329 U.S. 686, 67 S.Ct. 365, 91 L.Ed. 602 (1946), granting certiorari and reversing per curiam In re Chicago, R. I. & P. Ry. Co., 155 F.2d 889 (7 Cir. 1946), on the authority of *Vanston, supra.* In the reorganization of a subsidiary of the *Rock Island,* also in reorganization, the plan provided that the C. & M. bonds of the subsidiary should not be affected by the reorganization, since these were adequately secured and protected by income greatly in excess of interest requirements. The issue was whether under these circumstances the bondholders could recover interest upon their coupons as a part of their secured indebtedness after the dates of maturity. The Seventh Circuit held that they could; but, as noted above, the Supreme Court peremptorily reversed.

See also United States Trust Co. v. Zelle, *supra,* note 13.

their interest on the effective date of the Plan, and in not treating their accrued interest in the same manner as their principal.[16] As to the accrual of interest beyond the effective date of the Plan, the contention would have more merit if this were a conventional reorganization of a railroad which operated profitably and produced net income before fixed charges. But this is not such a reorganization. To paraphrase Lord Hardwicke who likened a bankruptcy to a shipwreck, this reorganization is like a total trainwreck; and applying equitable principles vis-a-vis the two system mortgages, the court is of the opinion that the Plan strikes a fair balance when it terminates the accrual of interest on the first system mortgage at the effective date of the Plan.[17] On the other hand, the total claim of the first mortgage bondholders embraces both principal and interest so accrued, and it would be more nearly in keeping with the absolute priority rule if these bondholders received common stock for this entire claim. The Plan should be modified accordingly.

The second system mortgage bondholders (or income bondholders) contend that they are entitled to interest on their principal in the stated amount of $7,121,994, which accrued for the years 1957, 1958 and 1959. This contention as to the quantum of their claim (principal plus such accrued interest) is warranted by the terms of their trust indenture and is legally sound. The Plan should, therefore, also be modified to give recognition to this addition to their claim.

 While post-reorganization interest on pre-reorganization secured state and local tax claims are disallowed, the bondholders, who also are secured creditors, should not be prejudiced by the law's delay. United States v. Harrington, *supra.* Where the liquidation of the New Haven, a completely insolvent railroad, was, on the court's order, held up at the expense of the bondholders, to the extent of about 60 million dollars, so that the railroad would continue to operate in the public interest, including the vital interests of the Federal Government and of all four of the States concerned, it

---

16. Under the Plan the first mortgage bondholders are to receive common stock in the reorganized company for their principal; and one warrant for each $25 of accrued interest to the effective date of the Plan. As to this, see note 17, *infra.*
 The income bonds are to receive one warrant for each $50 of their principal, with no payment for any interest accrued on the bonds. See *Class J* and *Class K* of Section V, 2.

17. And there is also excellent authority for this. R.F.C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 521, 66 S.Ct. 1282, 1384, 90 L.Ed. 1400 (1946) (The reorganization proceeding was instituted Nov. 1, 1935; the effective date of the plan was Jan. 1, 1943; the I.C.C. approved the plan June 14, 1933; the district court approved the plan October 25, 1943 and thereafter confirmed the plan on Nov. 29, 1944. The Supreme Court stated: "The effective date of the plan was fixed by the Commission as January 1, 1943. This was in its power. [Citing Ecker v. Western Pacific R. Corporation, 318 U.S. at page 509, 63 S.Ct. at page 724, 87 L.Ed. 892. 'Interest ac-

crues on the secured claims until the effective date of the plan. Group of Investors v. Milwaukee R. Co., 318 U.S. at page 546, 63 S.Ct. at page 741, 87 L.Ed. 959 * * *.'] The allocation of the securities took into consideration the interest of the secured claims to that date. Any gain or any loss after that time was a benefit or an injury to the new common stockholders and then sometimes to security holders in positions senior to them.").
 As to the effective date of the Plan, Section I, 10 provides:
 "10. Effective date—the date of the Commission's order, as provided in section 77(d) of the Bankruptcy Act, approving the plan, thereafter certified to the court."
 The Commission's Fourth Supplemental Report and Order is dated November 25, 1968; service date is December 2, 1968. It would seem, then, that December 2, 1968 is the effective date of the Plan. The Commission's Fourth Supplemental Report approving the Plan, however, contains calculations of creditors' claims, including accrual of interest on the first mortgage bonds, to December 31, 1968. See 334 I.C.C. at 94, 126.

cannot be gainsaid that the delay was caused by the law, i. e. the reorganization proceedings themselves. Such financial assistance as came to the New Haven during reorganization from the governmental bodies, though of help, amounted to about one-third of the passenger service losses alone. It did not begin to make up for the losses of the whole system. The court on January 8, 1962, by Order No. 54, approved the Trustees' non-payment of state and local tax claims both past due and to become due, and ordered their future deferral—a step which was imperative in order that the railroad could be kept running. The necessity for this suspension of tax payments continued until the inclusion of New Haven's rail operations in the Penn Central system. Continuance of rail operations was crucial to the economic well being of the states and the local communities and, in view of the fact that this was for the most part sustained at the expense of the bondholders, it would be inequitable in the extreme to allow the state and local tax claims to be accorded the priority of post-reorganization interest on pre-reorganization secured taxes and deny post-reorganization interest on the system mortgages, when fairness calls for just the converse. This does not violate the absolute priority doctrine that "existing priorities must be recognized up to the bar date of initiation of the proceedings; but thereafter they stand as then established and are fully discharged upon consummation of the final plan of reorganization." State of New York v. Feinberg, 204 F.2d 502, 503 (2 Cir. 1953), (on the authority of Northern Pac. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 951 (1912)):

While interest on unpaid post-reorganization state and local tax claims, both secured and unsecured, would normally be paid, the considerations and principles stated above also warrant disallowance of interest on these claims.

The Supreme Court decision in Nicholas v. United States, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966), does not militate against this. Incidentally, the enforcement of penalties in that case on the ground that the trustee in bankruptcy failed to file certain required Federal tax returns is not applicable to the New Haven reorganization because either no such returns were required or, if they were, the trustees filed them. Its holding that taxes incurred during a Chapter XI proceeding itself will carry interest was based upon the fact that delay in payment was brought about as a result of the debtor's own request that it be given a chance to rehabilitate itself and not because of the "law's delay." In the case of the New Haven there was never any thought of its rehabilitating itself because it was, at the time of the petition and had been for several years prior thereto, hopelessly insolvent. The sole purpose of pursuing a § 77 reorganization under the court's order, was to seek a means of keeping the New Haven in operation in the public interest. The delay was imposed upon the debtor's estate in this fashion and for this purpose. The ordered accumulation of accrued but unpaid taxes, as well as the interest on them, was not directed by the court as a matter of administrative convenience but as a matter of necessity. *Nicholas* gives recognition to and reaffirms the principle that the bankrupt estate should not be disadvantaged by means of the "law's delay".

Further, post-reorganization tax claims are administration expenses. With the single exception of the trustees' certificates, which bear interest, but are in a unique category for reasons previously stated, all administration claimants should be treated alike and equitable considerations compel the disallowance of interest on their claims. The provisions of the Plan disallowing interest are not erroneous.

The matter of the dischargeability of claims for interest has been discussed *supra*, footnote 7, but it may be added that, while interest on certain non-dischargeable claims such as some tax claims in ordinary bankruptcy, § 17 of the Act, and in Chapter XI arrangements, under § 371 of the Act, will sur-

vive discharge of the bankrupt. None of these provisions apply to railroad reorganizations under § 77. Subdivision (f) of § 77 is broad and sweeping and whether the debtor's assets are retained by it, with a revised capital structure, or its assets transferred to a new corporation, all claims against the debtor will be discharged, except as otherwise provided in the order confirming the Plan.

### Penalties

■ Pre-bankruptcy tax penalties, although liened, are not allowable in ordinary bankruptcy. Simonson v. Granquist, 369 U.S. 38, 82 S.Ct. 537, 7 L.Ed.2d 557 (1962). This doctrine should be applicable in this reorganization on equitable principles because penalties are not favored.

■ While a bankrupt estate is subject to post-bankruptcy penalties where the trustee does not discharge post-bankruptcy taxes and related charges, when he has the ability to do so, Boteler v. Ingels, 308 U.S. 57, 60 S.Ct. 29, 84 L.Ed. 78, 442 (1939), or fails to make federal tax returns, Nicholas v. United States, *supra*, these principles are inapplicable to the New Haven estate. The Trustees did not have the ability to pay the taxes in question and keep the railroad operational, and, as stated above, this court ordered the deferral of the payment of taxes. Under these circumstances to allow tax penalties would unjustly prejudice the bondholders and they are therefore not collectible against the debtor's estate. See also California State Board of Equalization v. Goggin, 183 F.2d 489 (9 Cir. 1950) (where Chapter XI receiver would have had to pay penalty on pre-bankruptcy tax to have avoided subsequent tax penalties, including penalty on post-Chapter XI tax, subsequent penalties were not allowable since receiver could not legally pay first penalty), cert. den. 340 U.S. 891, 71 S.Ct. 207, 95 L.Ed. 646 (1950).

### General Principles Governing Remand

No one has objected to the Plan for creation of an investment company. The court is of the opinion that this feature of the Plan is for the benefit of all interested parties. Some creditors proposed changes in the provision governing the board of directors. The Commission may re-examine such suggestions, but the present provisions are sound. If a change is to be made, it should be in the direction of strengthening the tenure of the board so that no one interest can capture or dominate the board during the life of the investment company, which is created to permit a greater realization for all interested parties.

When the price is finally determined, the Commission may reconsider the Plan vis-a-vis the two system mortgages, and other interested parties, to determine how the additional consideration, if any, is to be paid and whether this or a reduction in the price will require a modification in the structure of the Plan. Subject to what has been said concerning satisfaction of the trustees' certificates, compensation of counsel and Indenture Trustees, the retention of power in the court to continue the liquidation of tort, per diem, tax and other claims up to the time the Plan is consummated, the status of tax claims, interest and penalties, the treatment of principal and interest of the first mortgage bondholders, and the amount of the claim of the income bondholders, it is the court's opinion that, following remand, the Commission should have sufficient flexibility of authority to implement the Plan and the modifications herein described in order that the Plan as revised will in all respects be fair, equitable and feasible.