MULLIGAN, Circuit Judge:
This is an appeal from an order entered by District Judge Robert C. Zampano of the District Court of Connecticut on April 10, 1980, approving a consensual plan of reor *957 ganization (“Compromise Plan”) for the New York, New Haven and Hartford R.R. (“New Haven” or “Debtor”). Since we find that the Compromise Plan provides for a fair and equitable distribution of the New Haven’s assets we affirm its approval. With the disposition of this appeal we trust that the proceedings involving the New Haven’s reorganization, various aspects of which have been before the Federal courts over a dozen times for almost two decades, have reached the end of the line.
I
The New Haven was at one point the largest railroad in New England and the sixth largest in the Northeast region. During the early part of this century it was beset with severe financial problems and found itself running deeply in the red. In 1935, it petitioned for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C. § 205, and emerged 12 years later a newly reorganized company with a vastly simplified debt structure. As part of its new capitalization, the New Haven issued two series of bonds: $95,703,700 principal amount of first and refunding mortgage bonds bearing interest at the rate of 4 percent per year (“Mortgage Bonds”), and $87,881,500 principal amount of general income mortgage bonds bearing interest at the rate of 4*/2 percent per year (“Income Bonds”).
Despite this reorganization, the New Haven was still unable to operate as a profitable enterprise and by 1961 it was saddled with a deficit of $36 million and was losing cash at the rate of $18 million a year. On July 7, 1961, it again petitioned for reorganization under section 77 of the Bankruptcy Act in the United States District Court for the District of Connecticut (“Reorganization Court”). Judge Robert P. Anderson, then Chief Judge of the District Court, approved the petition and appointed three trustees to administer the railroad during its second reorganization.
The New Haven trustees, aware that the railroad could not continue to function independently, hoped to find a larger and more financially secure railway that would be able to absorb the New Haven’s lines as part of its system. The opportunity came in March of 1962 when the Pennsylvania Railroad and the New York Central Railroad filed a merger application with the Interstate Commerce Commission (“Commission”). Within three months, the trustees sought inclusion in the proposed Penn Central system both through private negotiations and by formal petition filed with the Commission. Four years later, the Commission gave its approval to the proposed merger under the condition that the New Haven’s lines be included and it directed the parties to negotiate privately as to how this was to be accomplished. Pennsylvania R.R.-Merger-New York Central R.R., 327 I.C.C. 475 (1966). On April 21, 1966, a Purchase Agreement was executed in which the representatives of the Penn Central agreed to buy all of the assets of the New Haven in exchange for cash and stocks and bonds of the Penn Central.
In October 1966, the New Haven trustees filed with the Commission a “two-step” plan of reorganization (“Plan”). “Step I” of the Plan covered the sale of New Haven’s assets to the Penn Central and “Step II” detailed what the rights of New Haven’s creditors inter se would be once Step I had been carried out. The Commission, after reviewing the terms of the Purchase Agreement, concluded that $125 million was a fair price to pay for New Haven’s assets and it certified Step I of the Plan to the Reorganization Court for review. The Commission’s valuation of the assets was then challenged by several classes of New Haven’s bondholders before the Reorganization Court and in a separate proceeding brought before a three-judge district court in the Southern District of New York. Both courts independently concluded that New Haven’s assets were worth substantially more than $125 million and remanded the issue of valuation back to the Commission. New York, N.H. & H.R.R. First Mortgage 4% Bondholders Committee v. United States, 289 F.Supp. 418 (S.D.N.Y. 1968); In re New York, N.H. & H.R.R., 289 *958 F.Supp. 451 (D.Conn.1968). On December 2, 1968, the Commission reevaluated the assets at $140 million and also reviewed Step II of the Plan which it certified to the Reorganization Court.
All throughout this period the New Haven line was being operated at a deficit. In December 1968, Judge Anderson, concerned that the continuing erosion of the New Haven’s assets could amount to an unconstitutional taking, ordered that the assets be immediately transferred to the Penn Central and left the exact form and amount of consideration to be paid by Penn Central for a later determination. In re New York, N.H. & H.R.R., No. 30226 (D.Conn. Dec. 24, 1968) (Order Directing Inclusion of Debtor in Penn Central Company). After the assets had been conveyed, New Haven bondholders again sought to challenge the Commission’s valuation determination before both the Reorganization Court and the three-judge district court in New York. On May 28,1969, Judge Anderson reviewed Step I of the Plan. In re New York, N.H. & H.R.R., 304 F.Supp. 793 (D.Conn.1969), aff’d in part, vacated in part sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). He again disagreed with the Commission and concluded that New Haven’s assets, now in the hands of Penn Central, were worth $175 million. Three weeks later, the three-judge district court, in its decision on valuation, approved the figure of $140 million reached by the Commission. New York, N.H. & H.R.R., First Mortgage 4% Bondholders Committee v. United States, 305 F.Supp. 1049 (S.D.N.Y.1969), vacated sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).
On July 28, 1969, Judge Anderson filed his opinion on Step II-the distributive aspects-of the Plan. In re New York, N.H. & H. R.R., 304 F.Supp. 1121 (D.Conn.1969). In it he decided, inter alia, that the Mortgage Bondholders, whose claims were senior to those of the Income Bondholders, should be entitled to interest on their claims up to the effective date of the Plan, which at that time was December 2, 1968. Although Judge Anderson had hoped at this point to enter his formal approval of the entire Plan, he recognized that a final decision would have to await the outcome of the still-unsettled issue of the valuation of New Haven’s assets. Id. at 1123-24.
In the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), the Supreme Court reviewed the conflicting decisions of the two district courts. The Court held that primary jurisdiction over the pricing issue lay with the Reorganization Court, and it affirmed Judge Anderson’s valuation of New Haven’s assets. Eight days prior to the Court’s decision, however, the Penn Central itself petitioned for reorganization under section 77 of the Bankruptcy Act. Since Penn Central securities, which were to make up the bulk of the consideration for New Haven’s assets, substantially declined in .value, the Court remanded the case to the Commission and the appropriate federal courts for further proceedings. On remand, Judge Anderson attempted to impose an equitable lien on the assets that the New Haven had already transferred to the Penn Central, but his decision was vacated by this court for lack of subject matter jurisdiction, and the case remanded to the Commission. In re New York, N.H. & H.R.R., 457 F.2d 683 (2d Cir.), cert. denied, 409 U.S. 890, 93 S.Ct. 106, 34 L.Ed.2d 147 (1972). Efforts by the New Haven trustee [1] to proceed on the reorganization were then held up by the Commission pending a resolution of the Penn Central reorganization.
During late 1975, representatives of the Penn Central met with its creditors in order to work out a compromise of the various claims against the Penn Central estate. As a settlement with the New Haven estate, the Penn Central trustee agreed to transfer $12.8 million in cash, plus the securities which we describe hereafter.
*959 On April 18,1978, the New Haven trustee filed an amended plan of reorganization (“Amended Plan”) which primarily dealt with the distribution of the estate’s assets. The Amended Plan reflected both that there had been a reduction of some $60 million in administrative claims as a result of settlements made since 1968 and that the consideration received from the Penn Central was of a different nature and value than that originally anticipated.
Hearings on the Amended Plan commenced on October 12, 1978 before Judge Robert C. Zampano, who became the presiding judge of the New Haven Reorganization Court after Judge Anderson had died on May 2, 1978. Both the Income Bondholders and the Mortgage Bondholders had serious objections to the Amended Plan. The Income Bondholders’ main contention was that the Mortgage Bondholders should only be entitled to interest on their bonds up to December 2,1968, and not until whatever date the plan of reorganization was finally approved by the Reorganization Court as proposed by the Amended Plan. The Mortgage Bondholders argued that the Amended Plan greatly overvalued the assets held by the estate by failing to look to the market price in assessing the value of the Penn Central securities. Judge Zampano, who recognized that continued litigation over the features of the reorganization plan would probably take years and consume millions of dollars of the estate, repeatedly urged the parties to resolve their differences and agree upon a compromise plan. After several lengthy conferences, however, the parties were unable to reach a compromise.
The court was therefore compelled to rule upon the trustee’s Amended Plan and after hearing the competing claimants, to structure its own plan. After some 46 days of hearings, three days of oral argument, the submission of 800 pages of briefs and 200 pages of exhibits, the court, on February 14, 1980 rendered a 75 page opinion (“February 14th Opinion”) which modified the trustee’s Amended Plan, accepting some of the contentions of the competing claimants and rejecting others. It constituted a painstaking and careful weighing of the arguments presented by all of the parties and it represented in itself a compromise among those who had presented sharply contrasting views on the complicated factual and legal valuation issues here involved.
Subsequent to the filing of the decision, representatives of the Mortgage Bondholders and the Income Bondholders, both of whom had indicated their intentions to appeal the decision, met in an effort to reach a settlement. As a result of their negotiations, they formulated a mutually agreed upon plan of reorganization (“Compromise Plan”). The Compromise Plan was submitted to the Reorganization Court on March 4, 1980, and after a hearing held on April 10, 1980, it was approved by Judge Zampano in an order filed on April 10th and supplemented by an. opinion filed on April 14, 1980.
Thomas B. Barry, an Income Bondholder, then brought this appeal, claiming that the Compromise Plan was not “fair and equitable” in that it allowed the Mortgage Bondholders post-petition interest on their claims beyond December 2, 1968. He requests that we remand the case back to the Reorganization Court for further proceedings on the plan of reorganization for the New Haven.[2]
II
The courts generally favor compromise as compromises are “a normal part of the process of reorganization.” Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 130, 60 S.Ct. 1, 14, 84 L.Ed. 110 (1939). The Supreme Court has noted that “[i]n *960 administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.” Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) (“TMT”). Normally courts are loath to investigate the merits of the controversy underlying a compromise. In the case of a section 77 reorganization, however, it is clearly the duty of the reviewing court to make an independent determination on whether the plan is “fair and equitable” as required by section 77(e) of the Bankruptcy Act,[3] even if the plan is the result of a compromise. TMT, supra at 424, 88 S.Ct. at 1163. That a large majority of the creditors have voted to approve of a plan, as here,[4] does not relieve the court of its responsibility. Id. at 435, 88 S.Ct. at 1168. Case v. Los Angeles Lumber Products Co., supra, 308 U.S. at 114, 60 S.Ct. at 6.
Appellant Barry is a Class H claimant of the New Haven estate who owns $310,000 in principal amount of the Debtor’s Income Bonds. While Barry appeals from the Reorganization Court’s order of April 10, 1980 which approved the Compromise Plan, he does not ask this court to review the Compromise Plan as a whole to determine whether it strikes a fair and equitable balance among the competing claims. Rather, appellant seizes upon only one issue which among many others was vigorously contested by the competing claimants. He claims that the court below erroneously permitted the Class G claimants, the Mortgage Bondholders, post-petition interest after December 2, 1968. He argues that by allowing interest to February 29, 1980, the effective date of the Compromise Plan, some $32 million was improperly added to the Mortgage Bondholders’ claim. The appellees, including the Indenture Trustee of the Income Bondholders, all urge that it is not the function of this court to determine the merits of a single contested issue but rather to determine whether the plan as a whole is equitable and fair in light of all of the issues which have been contested.
The appellees’ position is the correct one. “The very purpose of a compromise is to avoid the determination of sharply contested and dubious issues.” Connecticut Railway & Lighting Co. v. New York, N. H. & H. R. R., 190 F.2d 305, 307 (2d Cir. 1951). The test to be applied where there is a judicial review of a consensual plan of reorganization is whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities. See TMT, supra, 390 U.S. at 424-25, 88 S.Ct. at 1163; In re Penn Central Transportation Co., 596 F.2d 1102, 1114 (3rd Cir. 1979); Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960); In re California Associated Products Co., 183 F.2d 946, 949-50 (9th Cir. 1950); In re Equity Funding Corp., 416 F.Supp. 132, 145 (C.D.Cal.1975). The reviewing court must determine that the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved.
In the opinion and order approving of the Compromise Plan, the Reorganization Court did not in haec verba state that the compromise represented a distribution to the parties which was within the range of litigation possibilities had they sued rather than *961 settled. However, the court did explicitly note that the expense and delays occasioned by appeals and cross appeals would be avoided by compromise. Although Judge Zampano’s order and supplemental opinion are brief, we cannot sensibly characterize them as “boilerplate” as appellant suggests. They came on the heels of the exhaustive hearings which we have described, which gave him the opportunity to become intimately familiar with the issues involved in this protracted proceeding. While in his February 14th Opinion, Judge Zampano had necessarily made determinations on the merits, he obviously was aware that they were subject to appeal and therefore to reversal or amendment. In any event, whether a particular legal theory of a claimant is reasonably likely ultimately to succeed, presents an issue “on which our review must necessarily be plenary.” In re Penn Central Transportation Co., supra at 1114-15.
Ill
Under the Compromise Plan the Debtor will be reorganized to carry on business as a closed-end, nondiversified management investment company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-l et seq. It will be known as the New Haven Corporation and will be organized under the laws of Connecticut. Since it is recognized that the reorganized corporation will enjoy substantial tax advantages and has growth potential, the merits of reorganization over a straight liquidation are uncontested. The certificate of incorporation will authorize one class of 20,000,000 shares of new common stock having a par value of $1 per share.
The Compromise Plan groups the claims on the New Haven estate into 10 classes, Classes A to J. Classes A through F represent administrative expenses, tort claims, and various Federal, State and local tax claims, all of which will be satisfied in full by cash payment. Class I consists of general unsecured creditors and Class J, the New Haven stockholders. Since the estate is insolvent, these claims have no equity and will receive nothing under the Plan. The remaining claims are the Mortgage Bonds (Class G) and the Income Bonds (Class H). These claims are to be satisfied by the distribution of the new common stock of the reorganized company; the Mortgage Bondholders will receive 93% of the stock and the Income Bondholders will receive 7%. In addition, the Income Bondholders have an option exercisable within 60 days after the plan is consummated, to receive cash in lieu of common stock. The cash payment would equal $156.38 per $1,000 principal amount of Income Bonds. This is substantially in excess of the price the Income Bonds were recently trading for on the New York Stock Exchange. The funds are to be supplied by the American Financial Corporation which is the owner of 60% of the Mortgage Bonds. In exchange for the cash which it pays out, American Financial Corporation will receive the stock which otherwise would have been distributed to the Income Bondholders.
In assessing whether the distribution of the Debtor’s assets contemplated by the Compromise Plan is fair and equitable to appellant Barry as an Income Bondholder, it is necessary to examine what the Income Bondholders could receive if the issues not contested as a result of the compromise become the subject of a full-blown litigation. If a reasonable outcome of litigation would result in the Income Bondholders receiving less than that afforded them by the Compromise Plan, then the plan should be sustained.
It is uncontroverted that the Mortgage Bonds, which were initially issued when the New Haven emerged from a bankruptcy proceeding in 1947, are system mortgages secured by all the New Haven’s assets and are in all respects senior to the Income Bonds secured by the same collateral. The Mortgage Bondholders therefore must receive full compensation for their claim before the Income Bondholders receive anything. The claim of the Income Bondholders depends upon the extent to which the New Haven’s assets exceed the claim of the Mortgage Bondholders. Thus, one of the *962 more hotly contested issues during the proceedings before Judge Zampano was the valuation of the Debtor’s assets. The Mortgage Bondholders urged that the net asset valuation of the Debtor was approximately $75 million; the Income Bondholders placed the valuation in the range of between about $175 million and $246 million and the New Haven Trustee computed the range between $120 and $150 million. Judge Zampano in his February 14th Opinion determined the value to be $149.5 million. If the Mortgage Bondholders were to prevail on the valuation issue, then the appellant would receive no part of the Debtor’s assets even if he were to prevail on his claim that the Mortgage Bondholders should not receive post-petition interest on their bonds to February 29,1980. This is so because the Mortgage Bondholders’ uncontested claim to principal and interest up through December 2, 1968, amounts to about $101 million.
The sole tangible assets of the Debtor consist of cash and Penn Central securities which had been received by the Debtor under the Penn Central Plan of Reorganization as agreed to by the New Haven trustee and approved by Judge Anderson on May 1, 1978 in Order No. 850. Under the Penn Central Plan the New Haven estate received $12.8 million in cash; $28.8 million principal amount of Penn Central Series A Bonds; $7.5 million principal amount of Penn Central Series B Bonds; 1,815,000 shares of Penn Central Series B Preference Stock which has a redemption value of $36.3 million; $15.9 million principal amount of Penn Central Certificates of Beneficial Interest and 1,370,203 shares of Penn Central Common Stock which made the Debtor here the owner of about 6% of the outstanding shares of Common Stock of that company.
In valuating the securities held by the Debtor, Judge Zampano attempted to determine their “intrinsic” value, instead of looking to what they were trading for on the market. Calculating the intrinsic value requires an estimate of how much the enterprise, the reorganized company, could earn. Group of Institutional Investors v. Chicago M., St. Paul & P. R. R., 318 U.S. 523, 540, 63 S.Ct. 727, 738, 87 L.Ed. 959 (1943). This, of course, involves a prediction which cannot be made with any degree of certainty. Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941). Penn Central owns certain ongoing non-railroad businesses so that valuation based on intrinsic value requires an estimation of the evaluations of these subsidiary companies. Penn Central’s active acquisition program is continuing apace. See N.Y. Times, July 8, 1980, p. D4. Moreover, Penn Central is liquidating its assets consisting of real estate, rail lines, coal lands and certain investments. This is pursuant to an Asset Distribution Program, approved by the Penn Central reorganization court, In Re Penn Central Transportation Co., 458 F.Supp. 1234, 1255 (E.D.Pa. 1978), which will not be completed until prior to December 31, 1987. Another unpredictable is the amount to be received by Penn Central for the transfer of its rail assets to Conrail on April 1, 1976. That issue is in litigation, see In re Valuation Proceeding, 439 F.Supp. 1351 (Special Ct. 1977), 445 F.Supp. 994 (Special Ct. 1977), and while guidelines have been established, until a determination is made, predictions of how the award will affect Penn Central’s ability to redeem its debt-type securities and what “spillover” would remain to increase the value of the Common Stock, are of course highly conjectural.
On the other hand, use of market value, which was the approach urged by the Mortgage Bondholders, is a straightforward and usually reliable method of ascertaining the worth of securities. We have recently held that “in a free and actively traded market absent compelling reasons to believe otherwise, the market price [of stock] is held to take account of asset value as well as the other economic, political, and financial factors that determine ‘value’.” Seaboard' World Airlines, Inc. v. Tiger International, Inc., 600 F.2d 355, 361-62 (2d Cir. 1979). In E. I. Dupont de Nemours Co. v. Collins, 432 U.S. 46, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977), the Supreme Court sustained the SEC’s method of valuing a closed — end investment company by the market price of the under *963 lying securities which it owned. Other courts have also accepted the market value as the preferred method of valuing securities. See Mills v. Electric Auto-Lite Co., 552 F.2d 1239, 1247 (7th Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977); Amerada Hess Corp. v. Commissioner, 517 F.2d 75, 84 (3d Cir.), cert. denied, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975); Central States Electric Corp. v. Austrian, 183 F.2d 879, 884 (4th Cir., 1950), cert. denied, 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662 (1951); In re Equity Funding Corp. of America, 416 F.Supp. 132, 144 (C.D. Cal.1975).
While Judge Zampano recognized the force of these precedents, he concluded that the stigma of the Penn Central bankruptcy and the inability of investors to absorb and digest available information concerning the Asset Disposition Program, the Valuation case, and the complex capital structure of the Penn Central caused the market to underrate the securities. Yet the stigma of bankruptcy surely lessens as time goes by; the Penn Central securities have now been actively traded for almost two years and the price has remained fairly stable. And it is not unreasonable to assume that today’s sophisticated investor is capable of analyzing with some success the future prospects of the Penn Central.
We need not, however, authoritatively determine whether the intrinsic value selected by Judge Zampano, or market value, or some value in between is the proper valuation for the securities held by the Debtor. The point is that the market value approach advocated by the Mortgage Bondholders is a plausible methodology and one which we cannot say would not prevail if the valuation issue were appealed. Applying this method to the Debtor’s assets would result in a valuation well below $101 million[5] and would leave the Income Bondholders with no equity. Thus, if the Compromise Plan were not adopted, it is within the range of litigation possibilities that appellant Barry will receive nothing, which is certainly less than what he stands to receive under the Compromise Plan.
We conclude that after 19 years of litigation and tribulation it was due and fitting that settlement be reached. We are fully persuaded that the Plan is equitable and fair and that it strikes a reasonable balance between the conflicting claimants. The underlying legal issues here were complicated and the settlement avoided the litigation which would unquestionably have occurred had there been no compromise. We find no abuse of discretion by Judge Zampano in approving the Compromise Plan and affirm his order of April 10, 1980.

. As of March 1, 1969, the New Haven estate had only one trustee; one of the original three trustees retired in 1966, another died in 1969.

. Initially, Barry requested that the Compromise Plan “be reversed insofar as it provides for a claim on behalf of the Mortgage Bondholders which includes interest for the period subsequent to December 2, 1968.” Of course, we cannot reform the plan in such a piecemeal fashion. If this court ruled favorably on the merits of appellant’s isolated claim, the consensus would evanesce and the litigation which the Compromise Plan was designed to thwart would become an actuality.

. Section 77(e) provides in pertinent part that the court may approve a reorganization plan if it:
is fair and equitable, affords due recognition to the rights of each class of debtors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders .

. The Compromise Plan was accepted by 99.95% of the Mortgage Bondholders who validly voted and 92.83% of the Income Bondholders who validly voted. These were the only claimants entitled to vote on the plan. Report of Connecticut Bank and Trust Company Concerning Voting on Plan of Reorganization for the Debtor dated June 11, 1980.

. As of December 31, 1979, the market value of the Penn Central securities held by the New Haven estate aggregated $56,344,969. Report of the Trustee dated February 12, 1980.